

U.S. Department of Justice

United States Attorney
Eastern District of New York

FTB:RMS
F. #2022R00664

271 Cadman Plaza East
Brooklyn, New York 11201

August 6, 2024

By ECF

The Honorable William F. Kuntz II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Pollack
                  Criminal Docket No. 22-428 (WFK)

Dear Judge Kuntz:

      The government respectfully submits this letter in advance of the sentencing of the defendant Say-Quan Pollack, also known as "Say-Quan Pollock," which is scheduled for August 12, 2024. For the reasons stated below, the government requests that the Court impose a term of imprisonment of 87 months, followed by a term of supervised release, and order restitution in the amount of $402,639. Such a sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a).

    I.    Background

        A.  Procedural History

      On September 21, 2022, a grand jury sitting in the Eastern District of New York returned a three-count indictment (the "Indictment") charging Pollack, Juwan Anderson and Shamar Legette (collectively, "Defendants") with Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951(a); Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). ECF No. 1.[1]

      On November 14, 2023, Pollack pled guilty, pursuant to a plea agreement (the "Plea Agreement"), to Hobbs Act robbery. PSR ¶ 1.

---

[1] Anderson pled guilty to Hobbs Act robbery on December 1, 2023, see ECF Nos. 83 & 85, and is scheduled to be sentenced by the Court on October 30, 2024, see ECF No. 109. The charges against Leggette subsequently were dismissed on the government's motion following Leggette's death on January 24, 2024. See Dkt. Entry Apr. 8, 2024; cf. ECF No. 102.

B.  Offense Conduct

The Church was a place of worship that held weekly religious services in Brooklyn, New York.  Id. ¶ 4.  Parishioners attended these services in person or virtually via live-steam.  Id.  Individual 1 was the founder and lead pastor of the Church, and his wife, Individual 2, was a member of the clergy as well.  Id. ¶ 5.

On Sunday, July 24, 2022, Defendants entered the Church, brandishing firearms and interrupting the religious service while Individual 1 preached from the pulpit.  Id. ¶ 6.  Defendants stole jewelry and other personal items—including a cross and a wedding ring—from the persons of Individual 1 and Individual 2.  Id.  The value of the stolen items totaled at least $402,639.  Id.

The robbery was captured on video surveillance, and the footage shows the violent nature of Defendants'—and specifically, of Pollack's—conduct.  On that Sunday morning, Defendants—masked and wearing all black—entered the Church, brazenly brandishing firearms while parishioners attended the service in person and via a live-stream.  The screenshot below shows Pollack just before he and his co-conspirators invaded this place of worship.



As these armed men stormed into the Church, parishioners and Individual 1 dove to the floor, while Individual 2 sought to shield her infant daughter who was sitting on her lap during the religious service. Pollack was the second to enter and initially stood guard at the doorway, pointing a firearm in the direction of the pulpit and the parishioners present in the room, as shown in the screenshot below.



Pollack subsequently walked to the pulpit as Individual 1 laid facedown on the floor and—while pointing a firearm at Individual 1's head—checked his person to ensure that all of his jewelry already had been snatched by Anderson and Leggette. The screenshot below depicts this harrowing encounter.



Shortly after the robbery, Defendants and several associates gathered in the lobby of a residential building in Brooklyn, New York, which also was equipped with a video surveillance camera. There, Pollack appeared to gleefully re-enact part of the robbery and then displayed what appears to be a diamond ring to others, as shown in the screenshots below.

  

II.        Applicable Law

The Supreme Court has explained that "a district court should begin all sentencing proceedings by correctly calculating the applicable the United States Sentencing Guidelines (the "Guidelines") range. Gall v. United States, 552 U.S. 38, 49 (2007). Though advisory, see United States v. Booker, 543 U.S. 220, 264 (2005), the Guidelines nonetheless are "the starting point and the initial benchmark," Gall, 552 U.S. at 49; see also Molina-Martinez v. United States, 578 U.S. 189, 198–99 (2016) (explaining that "[t]he Guidelines are the framework for sentencing and anchor the district court's discretion" (alternation and internal quotation marks omitted)).

After calculating the applicable Guidelines range, the court must consider the factors outlined in § 3553(a), see Gall, 552 U.S. at 49, and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing," United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) directs the court "in determining the particular sentence to impose" to evaluate: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. "[I]n the ordinary case, the [U.S. Sentencing] Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." Kimbrough v. United States, 552 U.S. 85, 109 (2007) (internal quotation marks omitted); see also United States v. Rueda-Zarate, 291 F. App'x 364, 366 (2d Cir. 2008) ("A Guidelines sentence will in the ordinary case 'reflect a rough

4

approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting Kimbrough, 552 U.S. at 109)); United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). That is because "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale." Rita v. United States, 551 U.S. 338, 348 (2007).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

III. Discussion

A. The Guidelines Calculation

As an initial matter, see Gall, 552 U.S. at 49; Molina-Martinez, 578 U.S. at 198–99, the government submits that the Guidelines calculation contained in both the PSR and the Plea Agreement is accurate, resulting in a Total Offense Level of 24, see PSR ¶¶ 16–26; Plea Agmt. ¶ 2. Because Pollack falls in Criminal History Category III, see PSR ¶ 31, the resulting Guidelines range is 63 to 78 months' imprisonment, see id. ¶ 60. Pollack has stipulated to this calculation and agreed not to appeal or otherwise challenge his conviction and sentence in the event the Court imposes a term of imprisonment of 87 months or below. Plea Agmt. ¶¶ 2, 4.

B. The § 3553(a) Factors Demand a Significant Term of Imprisonment

The government submits that an upward variance is warranted under the § 3553(a) factors.

1. The Nature and Circumstances of the Offense

The nature and circumstances of Pollack's offense require a substantial incarceratory sentence above the applicable Guidelines range. See 18 U.S.C. § 3553(a)(1). Pollack and his co-conspirators committed a violent, brazen robbery in a place of worship where individuals had come to pray, to seek solace, to find peace. But Pollack—who personally carried a gun, pointed it at parishioners, and shoved it in the face of one of the victims—disrupted that holy space for his own financial gain, specifically targeting members of the clergy.

As the Supreme Court has noted, "robbery is a serious crime deserving serious punishment." Enmund v. Florida, 458 U.S. 782, 797 (1982). This is especially true where, as here, a defendant's conduct recklessly endangers the lives of others. See, e.g., United States v. Pena, No. 14-CR-553 (WFK), 2016 WL 3582045, at *3 (E.D.N.Y. June 28, 2016). Although no one was physically hurt during the robbery, that was by no means guaranteed, as armed robberies can and often do lead to serious bodily injuries. Regardless, Pollack and his co-conspirators

undeniably terrified the men, women, and children participating in the religious service that Sunday morning, leaving lasting trauma on clergy members and parishioners alike. The nature and circumstances of this armed robbery thus warrant an upward variance to account for the particularly horrifying manner of the crimes Pollack perpetrated.

2. <u>Pollack's History and Characteristics</u>

Pollack conduct in this case is by no means an aberration. Indeed, at just 25, this is his <u>second</u> conviction for armed robbery. In 2015, Pollack and several co-conspirators committed a spree of <u>six</u> violent robberies in the span of mere weeks, as summarized below:

- Pollack and a co-conspirator approached a victim, put that victim in a chokehold, and stole the victim's cellular telephone, debit card, and credit card.

- Pollack and a co-conspirator approached a victim, displayed what appeared to be a firearm, and stole the victim's cellular telephone.

- Pollack and two co-conspirators grabbed a victim by the neck and stole the victim's cellular telephone.

- Pollack and two co-conspirators punched a victim in the head, causing the victim to fall to the ground, and stole the victim's cellular telephone and wallet. Pollack then forced the victim to provide the PIN number for the debit card and threatened to find the victim at their home if they did not provide the information.

- Pollack and a co-conspirator approached a victim, displayed what appeared to be a firearm, and stole the victim's cellular telephone and money.

- Pollack and a co-conspirator approached a victim, threatened to shoot the victim if the victim tried to move, and stole the victim's cellular telephone.

PSR ¶ 28. This conduct—much like the robbery to which he has admitted guilt here—clearly demonstrates a callous disregard for others.

Pollack's criminal record also indicates an apparent belief that rules do not apply to him. In addition to a lengthy disciplinary history from his period of incarceration in state custody in connection with the above-described armed robberies, <u>id.</u>, he committed yet another crime—albeit a misdemeanor—<u>just months</u> after being paroled following that five-year sentence, <u>id.</u> ¶ 29.

Pollack's arrest and detention in this case have done nothing to change his ways. Indeed, Pollack was such a problematic inmate at the Metropolitan Detention Center ("MDC") that he was transferred to the Hudson County Correctional Center ("Hudson"). Yet Pollack's

6

behavior did not improve at Hudson, given, for example, that just a few months ago in April 2024, he threatened a correctional officer there. Specifically, after the officer issued an infraction against Pollack when he refused to go in his cell during lock-in time, Pollack stated, "You really suck a lot of fucking dick for writing me up. I'm really going to give you a reason for writing me up. I'll have a nice surprise for you the next time I see you." When asked if that was a threat, Pollack responded, "Take it however you want it." Pollack subsequently stated, in part, "I am really going to the box next time I see you for this. Make sure you bring two uniforms next time you are on the job. I am going to make sure you remember my name. They will know who you are all throughout the building. . . You should really get my name and look me up and see who you are messing with." Bragging about his reputation at the jail ("look me up and see who you are messing with"), he suggested he would physically harm the correctional officer "next time" such that she would need a new "uniform[ ]," and he made clear he was not concerned with the consequences ("I am really going to the box next time I see you."). This certainly is not the conduct of an individual who has "turned the corner in his life," ECF. No. 116 ("Def. Mem.") 1, or is "making progress toward fundamental rehabilitation," id. at 4.

       Taken together, these facts "demonstrate[ ] a strong risk of recidivism and a lack of remorse for his conduct." United States v. Dacy, 301 F. App'x 45, 46 (2d Cir. 2008). Pollack's history and characteristics, therefore, further confirm that a significant term of imprisonment is warranted. See 18 U.S.C. § 3553(a)(1).

       Pollack argues that his difficult childhood and his age at the time of the instant offense merit a sentence below the applicable Guidelines range. Def. Mem. at 1, 4-5. However, the Guidelines themselves caution against such consideration. For example, "considerations based on age" must be "present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1 (emphasis added). Simply put, nothing about Pollack's age at the time of his crimes (23) is "so unusual or extraordinary to justify a downward departure" or downward variance. See United States v. Lyttle, 460 F. App'x 3, 10 (2d Cir. 2012) (summary order) (citing U.S.S.G. § 5H1.1). Further, the Guidelines explicitly state that "lack of guidance as a youth and similar circumstances indicating a disadvantaged upbringing are not relevant grounds in determining whether a departure is warranted." U.S.S.G. § 5H1.12 (emphasis added). While the government does not minimize the challenges that Pollack has faced, those challenges do not mitigate the need for a significant term of imprisonment given his history and characteristics as described above.

       The government has reviewed the letter submitted on Pollack's behalf by his foster parent, see Def. Mem. Ex. 1, and while he is fortunate to have such love and support, it is clear that the person described therein is wholly inconsistent with the man who, among other things, shoved a firearm into the face of an unarmed pastor lying prone on the floor of his church and then celebrated his conquest with friends. Pollack's claim of remorse conveniently appears for the first time at the time of sentencing, see id. at 6, and he notably provides no apology to the victims of his crimes in his submission to the Court, see generally id.[2]

---

[2]    Rather, he instead spends much of his submission casting aspersions against one of the victims, see Def. Mem. 2, 5-6, as if the victim's unrelated criminal conviction somehow justifies Pollack's decision to target members of the clergy and commit an armed robbery in a sacred space during a religious service. No one deserves to be victimized in the way Individual

7

3.  The Need to Afford Adequate Deterrence

A significant term of imprisonment also is necessary to afford both specific and general deterrence. See 18 U.S.C. 3553(a)(2)(B); cf. United States v. Davis, No. 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010) (emphasizing that, pursuant to § "3553(a)(2)(B) there are two major considerations: specific and general deterrence"). For one, a substantial incarceratory sentence is necessary because Pollack has proven himself to be undeterred by his prior five-year term of imprisonment for armed robbery. See United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001) (emphasizing that "a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve"). Moreover, in light of the local interest surrounding this case, others surely will notice what repercussions follow a conviction for armed robbery, and the Court should send the message that such conduct will result in a substantial loss of liberty.

C.  Restitution

Restitution is mandatory in this case, see 18 U.S.C. § 3663A, and Pollack has agreed to pay restitution in the full amount of each victim's losses as determined by the Court, see Plea Agmt. ¶ 1(e). Though no victim has elected to complete a loss affidavit, the government submits the attached records—previously produced to Pollack in discovery and summarized in the chart below—in support of its request that the Court order restitution in the amount of $402,639.

| Item | Bates Number of Supporting Documentation | Value of Item |
|---|---|---|
| Custom Diamond Cross Pendant | US_00001 | $7,995 |
| Custom Diamond Cross Pendant & Diamond Cuban Chain | US_00003 | $56,795 |
| Custom Diamond Miami Cuban Chain | US_00004 | $51,175 |
| Rolex Custom Diamond Watch | US_00005 | $21,500 |
| Custom Diamond Miami Cuban Chain | US_002347 | $134,999 |
| Cartier Custom Diamond Watch | US_002348 | $30,175 |
| Ring | US_002349 | $100,000 |
| | | **$402,639** |

---

1, Individual 2, their daughter, and the Church's parishioners all were. The Court should disregard Pollack's despicable attempt to shift blame to one of the victims.

IV. <u>Conclusion</u>

   For the reason sets forth above, the government respectfully requests that the Court impose a sentence of 87 months' imprisonment, followed by a term of supervised release, and order restitution in the amount of $402,639.

                Respectfully submitted,

                BREON PEACE
                United States Attorney

          By:  /s/
                Rebecca M. Schuman
                Assistant U.S. Attorney
                (718) 254-7000

cc:  Clerk of Court (WFK) (by ECF)
    Counsel of Record (by ECF)